No. [_____]

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

MARIE GAUDIN, Individually, and on Behalf of Others Similarly Situated,
*Plaintiff-Respondent,*

vs.

SAXON MORTGAGE SERVICES, INC.,
*Defendant-Petitioner.*

_____

## PETITION FOR LEAVE TO APPEAL PURSUANT TO FED. R. CIV. P. 23(F)

_____

From an Order of the United States District Court, Northern District of California
(Case No. 3:11-cv-01663 JST) Granting Class Certification
The Honorable Jon S. Tigar, United States District Judge

JOHN B. SULLIVAN (SBN 96742)
ERIK KEMP (SBN 246196)
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, 26th Floor
San Francisco, CA 94111-3600
Telephone:  (415) 398-3344

JEFFREY Q. SMITH
DAVID B. SALMONS
LAILA ABOU-RAHME
PATRICK STRAWBRIDGE
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone:  (212) 705-7000

Attorneys for Defendant and Petitioner
SAXON MORTGAGE SERVICES, INC.

## CORPORATE DISCLOSURE STATEMENT
[Fed. R. App. P. 26.1]

Saxon Mortgage Services, Inc. is a wholly-owned subsidiary of SCI Services, Inc., which is a wholly owned subsidiary of Saxon Capital Holdings, Inc., which is a wholly owned subsidiary of Saxon Capital, Inc., which is a wholly owned subsidiary of Morgan Stanley Mortgage Capital Holdings, LLC, which is a wholly owned subsidiary of Morgan Stanley, a publicly-held corporation. No other publicly-held corporation owns 10% or more of Saxon Mortgage Services, Inc. stock.

# <u>TABLE OF CONTENTS</u>

**Page**

RELIEF SOUGHT ...................................................................................1

INTRODUCTION ...................................................................................1

QUESTIONS FOR APPEAL ..................................................................4

BACKGROUND .....................................................................................5

    A.    Overview of HAMP and Treasury Requirements................................5

    B.    Plaintiff's Mortgage Loan .................................................................7

STANDARD OF REVIEW .....................................................................9

ARGUMENT ........................................................................................10

    I.    THE DISTRICT COURT COMMITTED MANIFEST ERROR BY FAILING TO APPLY THE RIGOROUS LEGAL ANALYSIS REQUIRED BY *DUKES* AND *COMCAST* ................10

        A.    District Courts Must Engage in a "Rigorous Analysis" of Rule 23's Requirements of Commonality and Predominance.......10

        B.    The Alleged Common Issues Will Not Yield Common Answers Apt to Drive the Resolution of the Case........................11

        C.    Individual Issues Specific to Each Applicant's Modification Decision Will Predominate over Any Common Questions ................13

        D.    The Absence of Any Classwide Methodology for Calculating Damages Confirms that Individual Issues Specific to Each Applicant Will Predominate over Any Common Questions ................17

    II.    IMMEDIATE REVIEW IS REQUIRED TO RESOLVE AN UNSETTLED, FUNDAMENTAL AND RECURRING QUESTION ........................................................................19

CONCLUSION .....................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blair v. Equifax Check Services, Inc.*,
   181 F.3d 832 (7th Cir. 1999) ........................................................................9, 20

*Campion v. Old Republic Home Protection Co.*,
   272 F.R.D. 517 (S.D. Cal. 2011) ................................................................16, 17

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005) ...............................................................3, 4, 9, 20

*Comcast Corp. v. Behrend*,
   __ U.S. __, 133 S. Ct. 1426 (2013).............................................................passim

*Corvello v. Wells Fargo Bank, N.A.*,
   No. 11-16234, 2013 WL 4017279 (9th Cir. Aug. 8, 2013)................6, 15, 19, 20

*De Giovanni v. Jani-King Int'l, Inc.*,
   262 F.R.D. 71 (D. Mass. 2009)........................................................................12

*Durmic v. J.P. Morgan Chase Bank, N.A.*,
   No. 10-cv-10380-RGS, 2010 WL 5141359 (D. Mass. Dec. 10, 2010)..............14

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ................................................................11, 12, 16

*Fairbanks v. Farmers New World Life Ins. Co.*,
   197 Cal. App. 4th 544 (2011) ..........................................................................17

*Faulk v. Sears Roebuck & Co.*,
   No. 11-cv-02159, 2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) ......................12

*Gaudin v. Saxon Mortg. Servs., Inc.*,
   820 F. Supp. 2d 1051 (N.D. Cal. 2011).............................................................8

*Gaudin v. Saxon Mortg. Servs., Inc.*,
   No. 11-cv-1663, 2011 WL 5825144 (N.D. Cal. Nov. 17, 2011)........................8

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ...........................................................................13

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ................................................................ 19

*Marlo v. United Parcel Service, Inc.*,
    639 F.3d 942 (9th Cir. 2011) ................................................................ 10

*O'Donovan v. CashCall, Inc.*,
    278 F.R.D. 479 (N.D. Cal. 2011) .......................................................... 17

*Sutcliffe v. Wells Fargo Bank, N.A.*,
    283 F.R.D. 533 (N.D. Cal. 2012) .......................................................... 19

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) ................................................................ 13

*Wal-Mart Stores, Inc. v. Dukes*,
    __ U.S. __, 131 S. Ct. 2541, 2551 (2011) ........................... 3, 4, 11, 12

*Wall Street Network, Ltd. v. N.Y. Times Co.*,
    164 Cal. App. 4th 1171 (2008) ............................................................. 14

*Wang v. Chinese Daily News*,
    709 F.3d 829 (9th Cir. 2013) ................................................... 12, 13, 15

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ........................................................................... 4, 12

Fed. R. Civ. P. 23(a) ........................................................................... 11

Fed. R. Civ. P. 23(a)(2) ............................................................ 2, 10, 11

Fed. R. Civ. P. 23(b) ........................................................................... 11

Fed. R. Civ. P. 23(b)(3) .................................................................. passim

Fed. R. Civ. P. 23(f) ................................................................... 1, 9, 20

Fed. R. App. P. 5 .................................................................................. 1

Cal. Civ. Code § 1605 ......................................................................... 16

## RELIEF SOUGHT

Pursuant to Rule 23(f) of the Federal Rules of Civil Procedure and Rule 5 of the Federal Rules of Appellate Procedure, Defendant Saxon Mortgage Services, Inc. ("Saxon"), respectfully petitions this Court for leave to file an interlocutory appeal from the Order Granting Plaintiff's Motion for Class Certification of the United States District Court for the Northern District of California, dated August 5, 2013, and entered into the docket on August 6, 2013 (the "Order").  A true and correct copy of the Order is attached hereto as Exhibit A.

## INTRODUCTION

This is one of dozens of nearly identical suits within this Circuit and throughout the country brought on behalf of individuals who sought—but, for various reasons, did not obtain—modifications of their mortgages under the Home Affordable Modification Program ("HAMP") created by the U.S. Department of Treasury ("Treasury").  Until the decision below, no court in any jurisdiction had certified a class to pursue claims arising from the denial of HAMP modifications. In breaking new ground, the District Court manifestly erred.  This type of case is uniquely ill-suited for class treatment.

To obtain a modification, applicants such as Plaintiff Marie Gaudin ("Plaintiff") had to make numerous representations about their qualifications. HAMP policies required lenders and their loan servicers to deny modifications to

applicants who made false statements or failed to satisfy any of the numerous HAMP conditions. Thus, determining whether the failure to modify a particular mortgage amounts to a breach of contract or other harm—as Plaintiff alleges— necessarily requires an individual analysis of (among other things): (1) the accuracy of each applicant's representations and financial and occupancy status; (2) whether Saxon's denial of a modification was permissible under the contract and/or required by Treasury; (3) the nature and content of Saxon's specific communications with the applicant; (4) whether there was consideration for Saxon's alleged obligation to modify an individual mortgage; and (5) whether the denial of a modification resulted in any economic damages to the borrower.

This highly individualized review necessarily precludes any finding of "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), much less a common issue that "predominate[s] over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Plaintiff's case demonstrates the individualized nature of the modification determinations. While Plaintiff complied with certain requirements, Saxon denied her a permanent modification because: (1) its records suggested that she had misrepresented her income;[1] and (2) her annual income failed to satisfy Treasury's criteria. In fact, the Order below

---

[1] Plaintiff submitted an affidavit below denying that she misrepresented her income or ever verbally provided the significantly higher amount Saxon recorded in her loan file. Gaudin Reply Decl. (ECF No. 96).

2

acknowledged that Saxon will argue, <u>with respect to each class member</u>, that "Defendant was still legally permitted to refuse to provide a loan modification for various reasons." *See* Order, at 10. But it nonetheless held that common questions would predominate over questions affecting individual class members and certified the class. This is no small error. The Order's failure to account for the highly individualized nature of Plaintiff's claims is "manifestly erroneous" and thus requires immediate review from this Court. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). Interlocutory review will ensure the parties do not have to "endure the costs of litigation when a certification decision is erroneous and inevitably will be overturned." *Id*.

Two specific categories of manifest error are evident from the face of the Order. <u>First</u>, it lacks the "rigorous analysis" of commonality and predominance required by the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011). The Order uncritically accepts Plaintiff's assertions; fails to analyze whether the alleged common questions would provide common answers to a crucial issue in the litigation; and ignores the numerous individual determinations that will predominate over any common questions at trial. Moreover, in direct violation of *Dukes*, the Order fails to decide merits issues that are essential to class certification.

<u>Second</u>, the Order violates the Supreme Court's command in *Comcast Corp.*

3

*v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013), that a district court "entertain arguments against [a Plaintiff's] damages model" and refuse certification when "individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1433. Plaintiff failed to advance <u>any</u> methodology for the calculation of classwide damages, and the Order ignores uncontested evidence that no such methodology was feasible, simply declaring that the determination of damages "does not appear to be an obstacle." Order, at 15.

This petition also presents an important and recurring legal question justifying interlocutory review: Whether claims based on the denial of a HAMP modification are ever amenable to class-action treatment. Numerous HAMP-modification cases proceeding in California and other jurisdictions involve, in aggregate, tens of thousands of borrowers and millions—if not billions—in alleged damages. This Court should intervene now not only to correct the manifest errors below, but to save substantial judicial and party resources and resolve an "unsettled and fundamental issue of law." *Chamberlan*, 402 F.3d at 958-59.

## QUESTIONS FOR APPEAL

1.     Whether the Order failed to apply the standard of Rule 23 review required by *Wal-Mart Stores, Inc. v. Dukes* where the "common" questions it identified would not determine on a classwide basis any issue central to liability

and where individual issues of contract formation, performance, and specific communications would predominate.

2.     Whether the Order violated the Supreme Court's holding in *Comcast Corp. v. Behrend*, that a district court must consider arguments regarding an insufficient classwide methodology for calculating damages, and deny certification when "individual damage calculations will inevitably overwhelm questions common to the class."  133 S. Ct. at 1433.

## BACKGROUND

### A.     Overview of HAMP and Treasury Requirements

Pursuant to legislation enacted in response to the financial crisis, Treasury created HAMP in early 2009 to help homeowners avoid foreclosure.  HAMP recognizes that for some loans (but not all), the borrower's monthly payment could be reduced to a level that (1) is affordable for the borrower and (2) still provides the investor who owns the loan a reasonable degree of financial benefit.  Order, at 2-3.  HAMP provides financial incentives for borrowers and investors to enter into loan modifications if they meet Treasury directives.  *See* Treasury Supplemental Directive 09-01 ("SD 09-01"), at 22-25 (ECF No. 73-3).

Participating servicers must execute a Servicer Participation Agreement ("SPA") with Fannie Mae, as financial agent for the Treasury.  Saxon executed a SPA in April 2009.  Order, at 3.  The SPA sets forth servicers' obligations and

requires them to follow uniform HAMP directives promulgated by the Treasury and to use form documentation like the Trial Period Plan (the "TPP") that forms the basis of Plaintiff's lawsuit. *Id.*; SD 09-01, at 1.

Treasury outlined a multi-step procedure to determine whether a borrower could receive a permanent modification. SD 09-01, at 4-10. The process began with the borrower providing financial information to Saxon by telephone. SD 09-01, at 5; *see also Corvello v. Wells Fargo Bank, N.A.*, No. 11-16234, 2013 WL 4017279, at *1 (9th Cir. Aug. 8, 2013). If the borrower qualified based on this verbal information, Saxon sent him a TPP. If the borrower returned a signed TPP and made the first trial payment, Saxon sent a counter-signed TPP to signify the official start of the trial period. ECF No. 93-1 (Def. Ex. 1, at 11:21-12:12, 19:5-11, 50:8-18).

Pursuant to Treasury's procedures, Saxon was required to verify borrowers' verbally-provided income information via tax returns or other documentation. SD 09-01, at 5.[2] If Saxon could not produce an affordable payment for a specific borrower within the parameters prescribed by Treasury, "the modification [would] not satisfy the HAMP requirements." HAMP FAQs Q2309, at 26 (ECF No. 85-1).

---

[2] Specifically, Saxon tried to identify a way to reduce the monthly mortgage payment to an amount that is 31% of each individual borrower's gross monthly income. SD 09-01, at 8-10.

If Saxon could produce an affordable payment that met Treasury's criteria (which it did not in Plaintiff's case), it could then move on to the next step in the qualification process.  Order, at 3; SD 09-01, at 4-5.  Throughout this process, borrowers had to make all trial payments on time.  By directives, Treasury extended the TPP several times from the initial three-month period, and borrowers were required to continue making the TPP payments through the extended period.[3]

### B.    Plaintiff's Mortgage Loan

Plaintiff owns a condominium subject to a mortgage loan that Saxon began servicing in December 2006.  Order, at 3.  In April 2009, Plaintiff asked Saxon for a HAMP modification and verbally represented that her income was significantly higher than her tax returns later revealed.  ECF Nos. 93-4, 93-7 (Monsivais Exs. 3, 6).  Based on this oral representation, Plaintiff preliminarily qualified for a TPP and Saxon sent her a proposed modified payment plan under which her monthly mortgage payment was reduced from $2,236.15 to $1,328.63.  *See* First Am. Compl. ("FAC") Ex. A (ECF No. 39).

Plaintiff's TPP was one of the many that were extended on multiple occasions at the direction of Treasury.  Order, at 4.  Ultimately, though, Plaintiff was denied a permanent loan modification for insufficient income.  *Id.*  In sharp contrast to Saxon's records of her verbally provided income, Plaintiff's verified

---

[3]  *See, e.g.*, SD 09-10 (ECF No. 85-2); HAMP Update (ECF No. 85-3).

7

income for 2007 was one percent of the income she had provided verbally, and she had a negative income for 2008.  ECF No. 93-7 (Monsivais Ex. 6); ECF. No. 92-1 (Def. Ex. 4, at Gaudin 0000154-55).  With almost zero or negative income, Saxon could not create a payment for Plaintiff that met Treasury's 31% requirement.

Plaintiff's initial Complaint, filed on April 4, 2011, was dismissed with leave to amend.  *Gaudin v. Saxon Mortg. Servs., Inc.,* 820 F. Supp. 2d 1051 (N.D. Cal. 2011).  Plaintiff's FAC survived a motion to dismiss because the Court deemed the revised allegations sufficient <u>at the pleadings stage</u>.  *Gaudin v. Saxon Mortg. Servs., Inc.*, No. 11-cv-1663, 2011 WL 5825144, at *4 (N.D. Cal. Nov. 17, 2011).  Thereafter, the parties engaged in class-related discovery.

On August 3, 2013 (decision issued August 6), the District Court granted Plaintiff's Motion for Class Certification and Appointment of Class Counsel.  The certified class is:

> All California residential mortgage borrowers who (a) entered into Homeowner Affordable Modification Program (HAMP) Trial Period Plans (TPPs) with Saxon Mortgage Services, Inc. effective on or before October 1, 2009, and (b) made at least three trial period payments, but (c) did not receive HAMP loan modifications.

Notice of Motion (ECF No. 81).

Plaintiff asserts class action claims for (i) breach of contract and the implied covenant of good faith and fair dealing, (ii) rescission and restitution, (iii) violation

of California's Rosenthal Fair Debt Collection Practices Act, and (iv) violation of California's Unfair Competition Law.  FAC ¶¶ 38-58.

## STANDARD OF REVIEW

Rule 23(f) provides this Court with "unfettered discretion" to grant or deny permission to appeal a class-certification order "based on 'any consideration that the court of appeals finds persuasive.'"  *Chamberlan*, 402 F.3d at 957 (quoting Rule 23 Advisory Committee Notes to 1998 Amendments, Subdivision (f)).  This Court has made clear that interlocutory review under Rule 23(f) is appropriate when "the district court's decision is manifestly erroneous" so parties are not burdened with the costs of unnecessary litigation.  *Id*. at 959.

Moreover, a certification decision independently warrants interlocutory appeal when it presents "an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review."  *Id.*  This permits the Court to "take earlier-than-usual cognizance of important, unsettled legal questions, thus contributing to both the orderly progress of complex litigation and the orderly development of law."  *Id*. at 958 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 293 (1st Cir. 2000)).  When an "important" issue can resolve the threat of "multiple overlapping class actions," review under Rule 23(f) is warranted.  *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 837-38 (7th Cir. 1999).

9

**ARGUMENT**

## I.  THE DISTRICT COURT COMMITTED MANIFEST ERROR BY FAILING TO APPLY THE RIGOROUS <u>LEGAL ANALYSIS REQUIRED BY *DUKES* AND *COMCAST*</u>

The Order fails to recognize that the decision to modify a particular borrower's mortgage is inherently individualized.  Different borrowers entered into TPPs with Saxon under differing circumstances, and ultimately were denied permanent modifications for different reasons, with different consequences.  The Order's failure to account for these differences contravenes recent Supreme Court case law explicitly mandating "rigorous analysis" before certifying a class.

### A.  District Courts Must Engage in a "Rigorous Analysis" <u>of Rule 23's Requirements of Commonality and Predominance</u>

A plaintiff seeking class certification must affirmatively demonstrate, by a preponderance of the evidence, that "there are questions of law or fact common to the class."  Rule 23(a)(2); *Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).  Moreover,  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In *Dukes* and *Comcast*, the Supreme Court emphasized the need for close scrutiny of class plaintiffs' allegations for both commonality and predominance.  In *Dukes,* the Court reversed a class certification order and held that Rule 23(a)(2) requires

10

the claims at issue to rest upon a "common contention . . . that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is <u>central to the validity of each one of the claims in one stroke</u>."  131 S. Ct. at 2551 (emphasis added).  *Dukes* expressly required a "rigorous analysis" under Rule 23(a), even if it "will entail some overlap with the merits of the plaintiff's underlying claim."  *Id.*  In *Comcast*, the Court made clear that "[t]he same analytical principles govern Rule 23(b)."  133 S. Ct. at 1432.

This Court has acknowledged that *Dukes* established "new precedent altering existing case law."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 974 (9th Cir. 2011).  After *Dukes*, "it is not correct to say a district court <u>may</u> consider the merits to the extent that they overlap with class certification issues; rather, a district court <u>must</u> consider the merits if they overlap with the Rule 23(a) requirements."  *Id.* at 981 (emphasis in original).

### B.    The Alleged Common Issues Will Not Yield <u>Common Answers Apt to Drive the Resolution of the Case</u>

The Order identified three allegedly common issues that satisfied Rule 23(a)(2).  None withstands the "rigorous analysis" required by *Dukes*.

<u>First</u>, the Order identifies "Saxon's uniform practices[.]"  Order, at 8.  But the Order <u>never</u> explains why resolution of Saxon's alleged "uniform practices" will "generate common answers apt to <u>drive the resolution of the litigation</u>."  *Dukes*, 131 S. Ct. at 2551 (emphasis added).  This Circuit has emphasized that

11

mere invocation of allegedly "uniform" practices is not enough to satisfy Rule 23 inquiry when "[d]issimilarities within the proposed class may 'impede the generation of common answers.'" *Wang v. Chinese Daily News*, 709 F.3d 829, 833 (9th Cir. 2013) (quoting *Dukes*, 131 S. Ct. at 2551). Because the Order fails to tie Saxon's alleged uniform practices to the likelihood of a "common answer to" a "crucial question," *Ellis*, 657 F.3d at 99 (emphasis added), it is erroneous.

Second, the Court identified as a common issue "whether the TPP is an enforceable contract, once it has been fully executed . . . and if it became binding when executed, whether the Class may recover some or all of their trial payments, nominal damages, or any other remedies under California law." Order, at 8. But assuming a binding contract was formed by the execution of the TPP, each class member cannot obtain damages without individual proof that he or she complied with HAMP requirements, truthfully represented his income and occupancy, and suffered economic harm from the denial. In other words, "[d]emonstrating that the terms of the contracts were the same for all class members accomplishes only half of the battle." *De Giovanni v. Jani-King Int'l, Inc*., 262 F.R.D. 71, 77 (D. Mass. 2009); *see also Faulk v. Sears Roebuck & Co.*, No. 11-cv-02159, 2013 WL 1703378, at *6-7 (N.D. Cal. Apr. 19, 2013) (rejecting contention that "systematic breach of contract is susceptible to common proof" or "can be resolved on a classwide basis").

Third, the Court identified as a common question for Plaintiff's UCL claim, "whether the public would likely be deceived." Order, at 8. But the Order does not explain how this can be resolved on a classwide basis when each borrower received different communications from different Saxon employees. Plaintiff premises her claims on these very communications. FAC ¶¶ 15-16, 20-28. The Order's analysis of this alleged commonality again was cursory, not "rigorous."

## C. Individual Issues Specific to Each Applicant's Modification Decision Will Predominate over Any Common Questions

Even if the issues identified by the Order were sufficiently common (and they are not), there is no basis for its conclusion that they will predominate over the individual issues inherent in each of Plaintiff's claims. Indeed, it is difficult to imagine something less susceptible to a classwide determination than a series of different decisions, made by different Saxon employees, for different reasons.

This Court has recognized, on several occasions, that Rule 23(b)(3) does not permit a court to rest its predomination analysis simply on "the fact, considered largely in isolation, that plaintiffs are challenging [a] uniform policy." *Wang*, 709 F.3d at 833; *see also Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 947 (9th Cir. 2009) (notwithstanding uniform classification of employees, proving that classification was improper "will require inquiries into how much time each individual . . . spent in or out of the office and how the [individual] performed his or her job"); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953,

13

958 (9th Cir. 2009) (holding that a "presumption that class certification is proper when an employer's internal exemption policies are applied uniformly . . . disregards the existence of other potential individual issues that may make class treatment difficult if not impossible").

Those same concerns require immediate review here. Any "rigorous analysis" of Plaintiff's claims reveals the need for individualized proof of numerous aspects of each of those claims. Indeed, the Order itself noted that Saxon would present individual defenses "in response to all Class Members" that it "was still legally permitted to refuse to provide a loan modification for various reasons," Order at 10 (discussing typicality), but the District Court failed to even address this issue in its predominance analysis. *Cf. Durmic v. J.P. Morgan Chase Bank, N.A.*, No. 10-cv-10380-RGS, 2010 WL 5141359, *4 (D. Mass. Dec. 10, 2010) (denying provisional class certification in HAMP modification case and noting potentially "unique defenses" against various plaintiffs, including an applicant's understating of his income, a change in appraised foreclosure value during the TPP period, and an applicant's overstating of his income).

These and other issues will predominate at trial and compel denial of certification under Rule 23(b)(3). Specifically:

- To recover for breach of contract, each class member will have to prove that she performed her own contractual obligations. *Wall Street Network,*

14

*Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1181 (2008). The Order contends that <u>if</u> Plaintiff is correct that all the obligations of the parties are set forth in the TPP, "there are no individualized issues going to performance that remain to be addressed." Order, at 12. But it offers no explanation as to why the TPP itself—which lacks any integration clause and was plainly tied to additional federal HAMP eligibility criteria—can reasonably be construed to set forth the <u>entire</u> agreement between each applicant and Saxon. *See Corvello*, 2013 WL 4017279, at *6 (noting Treasury Directive gives bank authority to notify borrower he does not qualify under TPP). Moreover, the Court's suggestion that <u>performance</u> can be determined from the face of the TPP itself makes no sense. Performance necessarily requires individualized inquiry into a party's actions—in this case, whether each applicant submitted truthful information and made all payments throughout the entire trial period.

- Each class member also will have to demonstrate that Saxon breached its own contractual obligations. Saxon evaluated each application on its unique circumstances and Treasury's HAMP requirements. Determining whether any specific decision to deny a modification amounts to a contractual breach by Saxon requires individualized proof, which renders certification improper.[4]  *See Wang*,

---

[4] The Court erred in suggesting that Saxon's reports to Treasury were complete and conclusive as to Saxon's reasons for rejecting a modification. Order, at 12-13. To the contrary, the reports to Treasury were not required to be complete or updated

709 F.3d at 835; *see also Campion v. Old Republic Home Protection Co.*, 272 F.R.D. 517, 531 (S.D. Cal. 2011) (rejecting class certification of breach of contract claim where "individualized inquiry would be necessary [] to determine whether class members whose [insurance] claims were denied were wrongfully denied").

•        The individualized question of adequate consideration also will predominate.  Saxon contends that many class members will be unable to satisfy the element of consideration because of their pre-existing obligation to make payments on their existing mortgages.  Cal. Civ. Code § 1605 (consideration does not include what party lawfully owes at time of consent).  The Order acknowledged that if this is true, the "class would be ripe for decertification," because "individualized issues would predominate" the question of consideration.  Order, at 14.  Because certification under 23(b)(3) turned on the answer to this merits question, the District Court was obligated under *Dukes* to decide it.  *Ellis*, 657 F.3d at 981.

•        Plaintiff's claims for violation of California's Rosenthal Act and UCL consumer debt-collection law are based upon oral and written communications with Saxon beyond the TPP.  *See* FAC ¶¶ 15-16, 20-28.  The Order ignores this aspect of these claims, relying instead on the District Court's own understanding

---

once a trial period ends.  *See* SD 09-1, at 19-20.  Nor do Saxon's reports to Treasury prevent it from raising any other defense to an individual's breach of contract claims.  The District Court cited no support for its contrary assumption.

that Plaintiff "can prove the falsity or deceptiveness of Defendant's practices from the four corners of the TPP itself and from Defendant's uniform practices."  Order, at 16; *see also id*. at 18.   But in determining whether Saxon's conduct was likely to deceive the public, the Court also has to consider the evidence Saxon will produce at trial, including evidence of individual borrower communications.  *See, e.g.*,  *Fairbanks v. Farmers New World Life Ins. Co*., 197 Cal. App. 4th 544, 562-65 (2011).   Questions about each borrower's specific communications with Saxon would thus predominate.  *See, e.g.*, *O'Donovan v. CashCall, Inc*., 278 F.R.D. 479, 498 (N.D. Cal. 2011) (individual issues predominate a Rosenthal Act claim when more than one communication is at issue); *Campion*, 272 F.R.D. at 536-37 (individualized inquiry needed as to UCL claim in light of "varying means by which misrepresentations are alleged to have been made").

### D.    The Absence of Any Classwide Methodology for Calculating Damages Confirms that Individual Issues Specific to Each Applicant Will Predominate over Any Common Questions

The Order recognizes that Plaintiff <u>never</u> put forth a coherent methodology for calculating classwide damages for any of the claims.  *See* Order, at 10 ("Plaintiff's complaint, motion, and reply brief could be clearer in describing the theory of damages she will seek on behalf of the Proposed Class"); 17 (noting that "[d]etermining damages from the proposed Rosenthal Act violation may not be as formulaic as Plaintiff suggests").  Nor did Plaintiff submit any expert testimony or

other evidence supporting any damages methodology. Saxon, on the other hand, submitted the expert report of Dr. Allan W. Kleidon, Ph.D.[5] Dr. Kleidon explained that there is no common formula for determining damages from the denial of a permanent loan modification because each class member's purported damages will differ depending on whether the individual was in default when the TPP began, whether and when foreclosure occurred, and the value each borrower ascribes to the opportunity to stay in his or her home for a longer or shorter period of time.

Rather than address the significant hurdles to any classwide methodology for calculating damages, the Order simply declares that "the calculation of damages, if plaintiffs prevail, does not appear to be an obstacle." *Id.* at 15. The Order does not explain why this is so, why Dr. Kleidon's report is incorrect (indeed, or that it is incorrect), or even exactly what Plaintiff's methodology would be. The decision thus directly contradicts the Supreme Court's requirement in *Comcast* that a district court must "entertain arguments" against a plaintiff's damages model, engage in a "rigorous analysis," and, if no viable damages model can be presented, deny certification because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." 133 S. Ct. at 1433.

The Order's only explanation for failing to address Saxon's evidence on damages is its assertion that "the presence of individualized damages cannot, by

---

[5] The District Court overruled Plaintiff's objections to Dr. Kleidon's report.

itself, defeat class certification under Rule 23(b)(3)."  Order, at 15 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  But that principle simply acknowledges that individualized <u>calculations</u> are permissible; it does not permit certification if there is no classwide damages <u>methodology</u>.[6]  Rather, as *Comcast* makes clear, the absence of any methodology "establishing that damages are capable of measurement on a classwide basis" means that a plaintiff "cannot show Rule 23(b)(3) predominance[.]"  133 S. Ct. at 1433.

Here, Plaintiff never presented <u>any</u> methodology, and the Court never identified one.  The certification of the class under Rule 23(b)(3) was manifest error, and should be reviewed.

## II.        IMMEDIATE REVIEW IS REQUIRED TO RESOLVE AN UNSETTLED, FUNDAMENTAL, AND RECURRING QUESTION

Dozens of cases challenging the denial of a HAMP modification are currently pending nationwide.  *See, e.g.*, *Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 549–50 (N.D. Cal. 2012) (collecting cases).  This Court's recent decision in *Corvello* held that a complaint based upon the denial of a HAMP modification could survive a motion to dismiss on the pleadings.  In doing so,

---

[6]  In *Leyva*, this Court noted that Plaintiff had shown that electronic payroll and time-keeping records "would enable the court to accurately calculate damages and related penalties for each claim" and thus "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated."  *Leyva*, 716 F.3d at 514.  Here, neither the District Court nor Plaintiff identified <u>any</u> approach that could be used on a classwide basis to calculate individual damages.

however, it warned of the type of individualized proof that would be required for Plaintiff to succeed. 2013 WL 4017279, at *6 (noting that servicer's defense that it "determine[d] that the plaintiffs were not qualified, and thus followed Treasury guidelines in choosing not to offer them permanent modifications . . . 'presents a factual dispute that cannot be resolved'" in a motion to dismiss).

This case thus presents an "unsettled and fundamental" question, important to this category of cases, and therefore satisfies the Rule 23(f). *Chamberlan*, 402 F.3d at 959. Immediate review would preserve substantial judicial and party resources by exploring the significance of the fact-specific issues flagged in *Corvello*. It also would ensure that parties like Saxon do not face the prospect of potentially inconsistent judgments (or succumb to the pressure to resolve the case before that stage, insulating the issue from review). *See Blair*, 181 F.3d at 837-38.

## CONCLUSION

For the reasons stated above, the Court should grant Saxon's petition for immediate appeal of the Order, stay class notice and other proceedings in furtherance of class certification pending resolution of the appeal, and, after full briefing and consideration, reverse the appealed Order.

Dated: August 20, 2013              SEVERSON & WERSON
                                    A Professional Corporation
                                    /s/Erik Kemp
                                    _____
                                              Erik Kemp

                                    *Attorneys for Defendant*
                                    *Saxon Mortgage Services, Inc.*

## CERTIFICATE OF COMPLIANCE
**With Type-Volume Limitation, Typeface Requirements,**
**and Type Style Requirements**
[Fed. R. App. P. 32(a)(7)(B)]

1.      This petition complies with the type-volume limitation of Fed. R. App. P. 5(c), because this petition does not exceed 20 pages, exclusive of the disclosure statement, proof of service, tables of contents and authorities and attached order.

2.      This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word, in Times New Roman, 14 point type.

Dated:  August 20, 2013

/s/Erik Kemp
                                        Erik Kemp

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIE GAUDIN,

          Plaintiff,

    v.

SAXON MORTGAGE SERVICES, INC.,

          Defendant.

Case No.  11-cv-01663-JST

**ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL, SETTING CASE MANAGEMENT CONFERENCE**

Re: ECF No. 81

Plaintiff Marie Gaudin ("Plaintiff") alleges that Defendant Saxon Mortgage Services, Inc. ("Defendant") offered her a Trial Period Plan ("TPP") loan modification document pursuant to the federal Homeowners Affordable Modification Program ("HAMP"), and then unjustifiably failed to deliver on promises contained within the document.  First Amended Complaint ("FAC"), ECF No. 39, at ¶¶ 1-6.  Plaintiff now moves to certify a class of California borrowers who entered into HAMP TPPs with Defendant through October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications (the "Proposed Class").  Plaintiff's Notice of Motion and Motion for Class Certification and Appointment of Class Counsel; Memorandum of Points and Authorities ("Motion"), ECF No. 81, at 1:21-28.

After considering the papers, the arguments of the parties at oral argument, and good cause appearing, the Court now GRANTS the motion.

/ / /

/ / /

/ / /

/ / /

*United States District Court*
*Northern District of California*

# I.    BACKGROUND

## A.    Factual Background[1]

In October 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765.  "The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures."  Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012) (citing 12 U.S.C. § 5219(a)).  "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure."  Id.  This program, the Making Home Affordable program, included HAMP as one of its central components.

HAMP is a voluntary program designed to induce servicers to provide permanent loan modifications to borrowers who are in default or at risk of default.  Wigod, 673 F.3d at 556; see also U.S. Department of the Treasury, Supplemental Directive 09-01 (April 6, 2009), available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf.  Under HAMP, mortgage servicers receive financial incentives from the government for each permanent modification they provide.  Id.  The program is designed to authorize modifications when it is

---

[1] Both parties have requested that the Court take judicial notice of U.S. Treasury Department documents that have been posted on the Internet.  ECF Nos. 76 & 85.  "[I]nformation ongovernment agency websites . . . [has] often been treated as [a] proper subject[] for judicial notice."  Paralyzed Veterans of Am. v. McPherson, Case No. C064670SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008).  The information contained in the documents is not disputed and the accuracy of the source is not reasonably questionable.  See Fed. R. Evid. 201(b).  Therefore, the Court grants the requests.  Plaintiff objects on hearsay grounds to certain representations in the Monsivais Declaration, but the Court did not need to consider the truth of those assertions in resolving this motion, and so the objections are overruled as moot.  See ECF No. 94, at 11:11-17.  Finally, Plaintiff objects to the expert damages report of Allan Kleidon, ECF No. 88-8, on the following grounds:  (1) that "it is essentially 17 extra pages of legal argument," in violation of the Local Rules; (2) "that it is not admissible expert opinion testimony because it cannot 'help the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702(a)"; (3) that pages four through seven of the declaration "are complete hearsay and lacking in any foundation"; (4) "the recitation of the law with respect to what remedies are available, is impermissible expert witness testimony."  These objections are overruled.

United States District Court
Northern District of California

United States District Court
Northern District of California

(1) possible to create an alternate payment schedule that is affordable for the borrower given his or her income, and (2) financially profitable for the investor.  Id.  To accomplish these goals, the program provided that a modification was warranted only if the borrower met certain income requirements and other criteria, and if a net present value assessment showed that a modified mortgage would produce a greater return to the servicer than the unmodified mortgage.  Id.

Defendant Saxon entered into an agreement with the Treasury Department to participate in HAMP in April 2009.  Declaration of Veronica Monsivais in Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Monsivais Decl."), ECF No. 89, at ¶¶ 6-7 & Exh. 1.  Defendant received written and verbal direction in implementing the program from the Treasury Department, including a form TPP that Defendant utilized through at least October, 2009.  Deposition of Tim Lightfoot, ECF No. 88-1, at 10:20-12:15, 21:12-22:3, 30:7-17, 43:6-14.

Plaintiff Marie Gaudin owns a condominium subject to a mortgage loan that has been serviced by Defendant since December 2006.  Monsivais Decl., at ¶ 23; Declaration of Plaintiff Marie Gaudin in Support of Motion for Class Certification ("Gaudin Decl."), ECF No. 74, at ¶ 4. In April 2009, Plaintiff provided income and other information to Defendant's representatives for a potential HAMP modification.  Monsivais Decl., at ¶ 24; Gaudin Decl., at ¶¶ 6-7.  In May 2009, Saxon sent Plaintiff the subject TPP offer as part of a standard HAMP application package. Monsivais Decl., at ¶ 24; Gaudin Decl., at ¶ 8.  The Court described the provisions of the TPP in a previous order:

> Gaudin's TPP bears an "effective date" of June 1, 2009, and is titled, "Home Affordable Modification Trial Period Plan." Immediately below the title is a parenthetical stating, "Step One of Two–Step Documentation process." The first full paragraph of text provides, in relevant part, "if I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement . . . ." (Emphasis added.) The second paragraph continues, "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan, if I qualify for the Offer or will send me written notice that I do not qualify for the Offer.  This plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature." (Emphasis added.)  The TPP is in fact signed by both Gaudin and the lender, thereby implying that the lender found Gaudin to be qualified for a permanent loan modification.

3

Paragraph 2 G of the TPP is also relevant to evaluating Saxon's potential obligations. It provides:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the a Modification agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan. I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as necessary, to ensure that the modified mortgage Loan retains its first Lien position and is fully enforceable. (Emphasis added).

> Finally, paragraph 3 of the TPP provides that the lender will make certain specified adjustments to calculate the new monthly payment amount. Then, "[i]f I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date." The paragraph concludes by explaining that upon execution of the Modification Agreement the TPP terminates and that the modified loan agreement thereafter governs the relationship between the parties.

Order Denying Motion to Dismiss Amended Complaint ("Second Order"), ECF No. 51, 2011 WL 5825144, at *2-3 (Nov. 17, 2011). Plaintiff signed and submitted the TPP, and Defendant countersigned it and returned it to her. Gaudin Decl., at ¶¶ 8-10. Plaintiff made the three monthly payments called for in the TPP, and continued making the monthly payments thereafter, eventually making 13 such payments. Gaudin Decl., at ¶¶ 12-13. Defendant later notified Plaintiff that it would not provide her with a loan modification – at first, on the erroneous grounds that she had not made her payments, but ultimately, on the grounds that she did not qualify for HAMP because her income was too low. Gaudin Decl., at ¶¶ 12-14; Monsivias Decl., at ¶ 26. Defendant claims that Plaintiff initially misstated her income in her conversations with Defendant. Monsivais Decl., at ¶¶ 24-26. Plaintiff denies this. Reply Declaration of Plaintiff Marie Gaudin, ECF No. 96, at ¶ 5.

## B.    Procedural Background

Plaintiff brought a proposed class action complaint in April 2011, bringing causes of action for breach of contract/implied covenant of good faith and fair dealing, rescission and restitution pursuant to Cal. Civ. Code §§ 1688-89, violation of the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal Civ. Code §§ 1788 *et seq.*, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  ECF No. 1.  Defendant moved to dismiss because, *inter alia*, the TPP was not an enforceable contract.  ECF No. 12.  The Court concluded that "the face of the document . . . strongly suggests" that it was an enforceable commitment, and that at least at the pleading stage Defendant had not shown that it failed for lack of consideration or indefinite terms.  Order Granting Motion to Dismiss, with Leave to Amend ("First Order"), ECF No. 36, 820 F. Supp. 2d 1051, 1053 (N.D. Cal. 2011).  However, after concluding that the TPP "was not, in and of itself a permanent modification, or an unconditional commitment by the lender to provide one," the Court dismissed the complaint without prejudice because Plaintiff "has not alleged that all of the conditions under which Saxon might be obligated to provide her a lender-executed permanent modification agreement were actually satisfied."  Id.

Plaintiff filed an amended complaint, bringing the same claims but this time expressly alleging that the TPP conditions had been satisfied.  FAC, at ¶¶ 29-30.  Defendant again moved to dismiss.  ECF No. 41.  Since "the original complaint was dismissed on grounds that Gaudin had entirely failed to allege satisfaction of the conditions set forth in the TPP, and "[t]he amended complaint remedie[d] that defect," the Court denied the motion.  Second Order, 2011 WL 5825144, at *4 (N.D. Cal. Nov. 17, 2011).  The Court also stated that:

> As the order dismissing the original complaint found, the TPP makes very clear that it is not, in and of itself, a loan modification nor is it an *unconditional* commitment by the lender to provide one. Saxon insists that any obligations it had under the TPP were limited to evaluating Gaudin's eligibility for a loan modification under the federal guidelines of the HAMP program, and to provide her a loan modification agreement if and only if she proved to be eligible under those guidelines and had otherwise complied with all her obligations under the TPP.  The flaw in Saxon's argument is that express language of the TPP simply does not include any such limitation or condition.  To the contrary, the TPP indicates that while it may initially be presented to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of it to the borrower

5

> (rather than notifying the borrower that he or she does not "qualify for the Offer"), then the borrower's eligibility for permanent modification has been determined, and the only remaining contingencies are those listed specifically in the TPP and summarized above.
>
> Saxon flatly states that, "[t]he TPP conditions Plaintiff's ability to obtain a permanent loan modification agreement on a number of factors, including . . . Plaintiff meeting all of the conditions required for modification under the HAMP guidelines," but it has pointed to no language in the TPP embodying such a limitation. While, as noted above, paragraph 2G requires the borrower to "meet all of the conditions required for modification," there is no indication that any of those conditions are to be found outside the four corners of the TPP. Additionally, to the extent that language arguably could be understood as referring to some broader (and unstated) rules for eligibility under HAMP or otherwise, then the lender's return of the signed TPP implies the borrower has been found to be qualified under such criteria.

Id., 2011 WL 5825144, at *3-4. Plaintiff then filed this motion for class certification.

## C.    Jurisdiction

This Court has jurisdiction pursuant to the provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*

## D.    Legal Standard

Class certification under Rule 23 is a two-step process. First, Plaintiff must demonstrate that the four requirements of 23(a) are met: "numerosity," "commonality," "typicality," and "adequacy." "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, --- U.S. ---, 131 S.Ct. 2541, 2551 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) are met. Here, Plaintiff invokes 23(b)(3), which requires plaintiffs to prove the elements of

United States District Court
Northern District of California

6

"predominance" and "superiority": "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met.  See Wal–Mart, 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

In addition, "[w]hile it is not an enumerated requirement of Rule 23, courts have recognized that "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." Vietnam Veterans of Am. v. C.I.A., 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir.1970)). "[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" Vietnam Veterans, 288 F.R.D. at 211 (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)).

## II.    ANALYSIS

### A.    Defined and Ascertainable Class

Plaintiff argues, and Defendant does not dispute,[2] that she has satisfied this requirement since Defendant's records identify each individual borrower who fits within the class.  See Declaration of Peter Fredman, Esq. in Support of Motion for Class Certification and Appointment of Class Counsel, ECF No. 84, at ¶¶ 8-9.  It is administratively feasible to ascertain whether

---

[2] Defendant's opposition brief contains no section specifically disputing that a class is ascertainable, but it does state in a footnote that the arguments it raises in opposition to commonality also apply to the requirement that there be an ascertainable class.  Saxon Mortgage Services, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Opp."), at 13:17, n. 22.  Defendant does not raise any arguments relating to an ascertainable class beyond those that apply to commonality, however, and as discussed at III-C, infra, the Court finds that commonality is satisfied.

United States District Court
Northern District of California

1   individuals are members of the class.

2   **B.**     **Numerosity**

3          Plaintiff argues, and Defendant does not dispute, that the number of potential class

4   members is large enough that the "joinder of all members is impracticable." Fed R. Civ. Pro.

5   23(a)(1). After reviewing the large number of potential class members, the Court agrees.

6   **C.**     **Commonality**

7          "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do. Wal-Mart,

8   131 S. Ct. at 2556 (internal citation omitted). Where questions common to class members present

9   significant issues that can be resolved in a single adjudication "there is clear justification for

10  handling the dispute on a representative rather than on an individual basis." Amchem Products,

11  Inc. v. Windsor, 521 U.S. 591, 623 (1997) (internal quotation marks and citation omitted).

12  However, the common contention "must be of such a nature that it is capable of classwide

13  resolution—which means that determination of its truth or falsity will resolve an issue that is

14  central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S.Ct. at 2551.

15  "What matters to class certification . . . is not the raising of common 'questions'—even in

16  droves—but, rather the capacity of a classwide proceeding to generate common answers apt to

17  drive the resolution of the litigation." Id. (quoting Richard A. Nagareda, Class Certification in the

18  Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).

19          Here, there are significant common questions of law and fact concerning the nature and

20  scope of the TPP. Motion, at 14:25-27 ("everyone in the Class entered into the same TPP with

21  Saxon and made at least the three trial payments it called for but did not obtain the loan

22  modification.") Among these questions are the following: (1) "Saxon's uniform practices,

23  including its admission that it did not consider the TPP legally binding", Motion at 17:27-28;

24  (2) whether the TPP is an enforceable contract, once it has been fully executed, see Motion at

25  2:14-15, 16:8-11, 16:23-24; and if it became binding when executed, "whether the Class may

26  recover some or all of their trial payments, nominal damages, or any other remedies under

27  California law", id. at 16:27-17:1, see also id. at 17:10-12 ("the legal nature, meaning and effect of

28  the TPP, and, as applicable, the remedy available for Saxon's failure to honor it"); and, with

United States District Court
Northern District of California

8

1  respect to Plaintiffs' UCL claim, "whether the public would likely be deceived," id. at 19:24-20:2.

2      The parties strongly dispute the nature and scope of the TPP. To Defendant, it was merely

3  an *application* for a loan modification, and any obligations Defendant incurred were contingent

4  upon it further investigating and determining whether the applicant's circumstances qualified the

5  applicant for inclusion in the program. To Plaintiff, it was a *binding contract*, which, after being

6  signed and countersigned by both parties, affirmed that Defendant would provide a loan

7  modification if Plaintiff made the three TPP payments. By determining whether the TPP is an

8  enforceable contract and whether the parties' performance obligations are fully contained within

9  it, the Court can resolve an issue central to the viability of the Proposed Class Members' claims.

**D.      Typicality and Adequacy of Representation**

11     "The purpose of the typicality requirement is to assure that the interest of the named

12 representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497,

13 508 (9th Cir. 1992). "The test of typicality 'is whether other members have the same or similar

14 injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

15 whether other class members have been injured by the same course of conduct.'" Id. (quoting

16 Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal.1985). "The adequacy of representation

17 requirement . . . requires that two questions be addressed: (a) do the named plaintiffs and their

18 counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

19 and their counsel prosecute the action vigorously on behalf of the class?" In re Mego Fin. Corp.

20 Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).

21     "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and

22 typicality criteria of Rule 23(a)." Amchem, 521 U.S. at 626, n. 20 (1997) (quoting Gen. Tel. Co.

23 of Sw. v. Falcon, 457 U.S. 147, 158, n. 13 (1982). Among other functions, these requirements

24 serve as ways to determine whether "the named plaintiff's claim and the class claims are so

25 interrelated that the interests of the class members will be fairly and adequately protected in their

26 absence." Falcon, 457 U.S. at 158, n. 13.

27     Plaintiff's alleged injury is similar to, even precisely the same as, the injury for which class

28 counsel will seek redress on behalf of all other members of the Proposed Class. Defendant's

9

issuance and countersigning of the TPP constitutes a single course of conduct to which all Class Members were subject.   Plaintiff's claims are sufficiently interrelated to the interests of the other Class Members.

Defendant argues that Plaintiff is subject to unique defenses because Defendant will argue that she misrepresented her income in her TPP application.   The Court is not convinced that this threat rises to a level posing "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."   Hanon, 976 F. 2d at 508.   Defendant's argument is similar to the same arguments it intends to raise in response to all Class Members: it will argue that, even after the TPP was signed and countersigned, Defendant was still legally permitted to refuse to provide a loan modification for various reasons.   This defense does not defeat typicality.

Defendant also argues that Plaintiff cannot establish typicality and adequacy of representation because other members of the Proposed Class may not benefit from the relief Plaintiff is seeking.   For example, Defendant argues that some Class Members may not benefit from the remedy of rescission and restitution, because they may have benefitted from paying the lower TPP payments and may not want to be returned to the *status quo ante*.   Plaintiff's complaint, motion, and reply brief could be clearer in describing the theory of damages she will seek on behalf of the Proposed Class.   However, the Court does not understand Plaintiff to be committed to seeking rescission and restitution as the only remedy she will seek for all Class Members.   See FAC 13:3-23   (seeking, among other relief, rescission, restitution, monetary damages, and statutory damages).   In any case, typicality is primarily an inquiry into alignment of interest rather than an investigation into the forms of relief for which the named plaintiff has prayed.   See Hanon, 976 F.2d at 508; see also Simpson v. Fireman's Fund Ins. Co., 231 F.R.D. 391, 396 (N.D.Cal. 2005) ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff") (quoted approvingly in Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 734 (9th Cir. 2007).   "[A] class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings."   Newberg on Class Actions § 4:54 (5th ed.).   The Court can also at a later stage certify subclasses of plaintiffs depending upon their particular situations, if it turns out

United States District Court
Northern District of California

10

to be necessary. At this stage, the Court can conclude that Plaintiff's interest and injury are sufficiently typical of those possessed by the Proposed Class Members, and that she will adequately represent their interests in this litigation.

## E.    Predominance and Superiority

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, --- U.S. ---, 131 S. Ct. 2179, 2184 (2011). In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses); then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried. <u>See</u> Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412. The predominance inquiry requires that plaintiff demonstrate that common questions predominate as to each cause of action for which plaintiff seeks class certification. <u>Amchem</u>, 521 U.S. at 620.

The Court analyzes each of the causes of action brought by Plaintiff in turn.

### 1.    Breach of Contract

"The elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." <u>Oasis W. Realty, LLC v. Goldman</u>, 51 Cal. 4th 811, 821 (2011). Plaintiff submits that "common issues predominate . . . because interpretation of the TPP is a matter of law," and that because the Proposed Class and Defendant "each executed the same TPP document, the questions pertaining to its nature, meaning and effect may be 'resolved with one stroke.'" Motion, at 16:13-14. The question under 23(b)(3) is whether this common question predominates over individual questions.

Defendant argues that proving breach of contract will require individualized determinations going to each of the four elements of breach of contract. Namely, it argues that the Court will need to determine whether each Class Member provided sufficient consideration (and thereby whether a contract existed), whether each Class Member performed her obligations under the contract (and therefore whether Defendant breached) and the amount of damages owed.

11

United States District Court
Northern District of California

#### a.    Performance

Plaintiff's theory of the case is that the TPP is an enforceable contract and that it contains within it all of the obligations necessary to determine breach and performance.  See Transcript of Proceedings, ECF No. 100, at 23:20-24:1.  If that legal question is resolved in its favor, there are no individualized issues going to performance that remain to be addressed.  The question can be resolved with a legal determination that is common to the Proposed Class.

Plaintiff also argues in the alternative that, if there any other conditions on Defendant's obligation to perform, it is only those – as the Court said in its second order – that are "listed specifically in the TPP."  Second Order, 2011 WL 5825144, at *3; see also Reply Br., at 11:10-21.  The only performance obligations cited by Defendant that are in the TPP are that "[i]f prior to the prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate."  The Class Members by definition satisfy the first two of these categories.  The third condition incorporates by reference the lender's representations from Section 1 of the TPP, namely that:

A.   I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B.   I live in the Property as my principal residence, and the Property has not been condemned;

C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

D.   I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that 1 receive, unless I wish to have such income considered to qualify for the Offer);

E.   Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F.   If Lender requires me to obtain credit counseling, I will do so.

TPP, at 1.  To determine whether an individual lender performed under the alleged contract, the Court will need to determine individually not *whether* each of these representations were true, but whether the Lender *determined* that these representations were no longer true and correct.  This can be ascertained reasonably easily from the available evidence.  Defendant's records reveal that it did not deny modifications to borrowers for the reasons listed in Section 1-C, 1-E or 1-F.  Monsivias Decl., at ¶ 19.  Defendant only denied modifications to a single borrower for reasons relating to Section 1-A, denied modification to about 1% of Proposed Class Members for reasons relating to 1-B, and denied modification to about 9% of Proposed Class Members for reasons relating to 1-D.  Id.  Therefore, even on Plaintiff's secondary theory of the case, for at least 90% of the Proposed Class, it does not appear that individualized determinations will be necessary to determine performance.

> **b.     Breach**

Defendant's brief does not appear to cite individualized issues going to breach beyond those that form the other side of the coin of performance.  See Opp., at 19:7-19.  That is to say, Defendant argues that it can only unjustifiably fail to perform where the lender fulfilled the requirements of the alleged contract.  This begs the question discussed *supra*.

> **c.     Consideration**

"[T]o find consideration . . . the promisee must confer (or agree to confer) a benefit or must suffer (or agree to suffer) prejudice."  Steiner v. Thexton, 48 Cal. 4th 411, 420-21 (2010).  Defendant argued in both of its motions to dismiss that Plaintiff failed to incur any obligation because she had a pre-existing duty to make her mortgage payments.  The Court rejected this argument twice.   First Order, 820 F.Supp. 2d at 1054; Second Order, 2011 WL 5825144, at *4.  The first time, the Court agreed with the reasoning of another court in this district that "the TPP payments are sufficient consideration and the additional consideration suffered was the credit

consequences of their partial mortgage payments and fulfilling the burdensome documentation requirements of the loan modification approval process." Lucia v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 1059, 1067 (N.D. Cal. 2011) (although that court held the consideration was sufficient to support the existence of the contract to participate in the TPP for the three month trial period, but not a contract for permanent modification after the trial period expired). The second time, this Court went on to note that "[a]dditionally, by promising to comply with the terms of the TPP, Gaudin exposed herself to greater liability for interest and late charges should permanent modification not be consummated." Second Order, 2011 WL 5825144, at *4.

Defendants now contend that "[a]lthough Saxon maintains that Plaintiff cannot demonstrate consideration, at a minimum, the issue of consideration is individualized," and that the Court must determine whether each borrower was exposed to additional interest or charges, and whether any borrowers suffered negative credit consequences. If Plaintiff intends to argue that certain specific borrowers incurred legal detriment for reasons other than incurring the obligations in the TPP, then the Court agrees that individualized issues would predominate. But the Court understands Plaintiff to be arguing that incurring the obligations *in the TPP itself* constitutes valid consideration. That legal question can be resolved on a class-wide basis. If the question is resolved in Defendant's favor, then the class would be ripe for decertification, since the Court is unlikely to allow Plaintiffs to argue on a class-wide base that individual plaintiffs tendered sufficient consideration because of their particular circumstances. But if the common question is resolved in Plaintiff's favor, no individualized determination into the lenders' particular circumstances will be necessary.

### d.   Damages

Even if it would require the court to consider the underlying merits of a case, a court must "entertain arguments against [a Plaintiff's] damages model," where those arguments "[bear] on the propriety of class certification." Comcast Corp. v. Behrend, --- U.S. ---, 133 S. Ct. 1426, 1432

1   (2013). However, "the presence of individualized damages cannot, by itself, defeat class

2   certification under Rule 23(b)(3)." Leyva v. Medline Indus. Inc., --- F.3d ---, Case No. 11-56849,

3   2013 WL 2306567, at *3 (9th Cir. May 28, 2013).

4       Defendant relies heavily on Comcast, in which the plaintiff's "[damages] model assumed

5   the validity of all four theories of antitrust impact initially advanced by [plaintiffs]," even though

6   only one of those theories remained in the case. Comcast, 133 S. Ct. at 1434. Plaintiff proposes

7   no calculation that would assess damages on the basis of dismissed or abandoned theories of

8   liability.

9       Beyond a citation to the Eastern District of Kentucky, Defendants cite no authority in

10  which courts found that individual damages issues predominated in similar situations. Even in

11  that case, the court denied certification because plaintiffs "have offered no manageable way to

12  calculate damages across the entire class." Cowden v. Parker & Associates, Inc., Case No. CIV.A.

13  5:09-323-KKC, 2013 WL 2285163, at *7 (E.D. Ky. May 22, 2013). In this case, the calculation of

14  damages, if plaintiffs prevail, does not appear to be an obstacle.

15      "Courts in every circuit have . . . uniformly held that the 23(b)(3) predominance

16  requirement is satisfied despite the need to make individualized damage determinations."

17  2 Newberg on Class Actions § 4:54 (5th ed.) "Indeed, a class may also be certified solely on the

18  basis of common liability, with individualized damages determinations left to subsequent

19  proceedings." Id. Given this standard, and the Court's understanding of Plaintiff's theory of

20  damages, common issues predominate over individualized damage assessments.

21      **2.    Rescission and Restitution**

22      Restitution is "synonymous" with unjust enrichment, and "there is no cause of action in

23  California for unjust enrichment." Melchior v. New Line Prods., Inc., 106 Cal. App. 4th 779, 793,

24  (2003). As for rescission, it is available under Cal. Civ. Code § 1689 when, inter alia, "the

25  consent of the party rescinding . . . was given by mistake, or obtained through duress, menace,

fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds," or "[i]f the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds." Proving this will involve substantially the same issues discussed *supra*, and the common issues predominate over individualized inquiries.

### 3.   Rosenthal Act

The Rosenthal Act creates state-law liability for a "debt collector collecting or attempting to collect a consumer debt," Cal. Civ. Code § 1788.17, who fails to comply with requirements of the Federal Debt Collections Practices Act ("FDCPA"), at 15 U.S.C. §§ 1692b-1692j. 15 U.S.C. § 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt."

Proving that Defendant made false representations or deceptive means to collect debt will mainly involve an inquiry into the nature of the TPP itself and Defendant's uniform practices related to issuing it to borrowers and countersigning it. Defendant points out that Plaintiff's motion does mention other allegedly deceptive practices Defendant engaged in when it made other verbal and written communications to Plaintiff. Opp. at 23:5-12. Again, however, the Court understands Plaintiff to be arguing on that she can prove the falsity or deceptiveness of Defendant's practices from the four corners of the TPP itself and from Defendant's uniform practices. On that understanding, common issues predominate.

Defendant argues that the Court will need to engage in an individualized inquiry to determine whether each borrower was in default at the time Defendant began serving his or her loan, because only borrowers so situated may bring a Rosenthal Act claim. This determination would be a relatively simple one to undertake, and so it does not defeat predominance. But in any case, it appears that the Rosenthal Act, unlike the FDCPA, does not require a borrower to be in default to bring a claim. "Despite the overlap between the federal and state statutory schemes, the

definition of 'debt collector' is broader under California law" than it is under the FDCPA.  Selby
v. Bank of Am., Inc., Case No. 09CV2079 BTM JMA, 2010 WL 4347629, at *6 (S.D. Cal. Oct.
27, 2010).  The FDCA's definition of 'debt collector' specifically excludes those who collect "a
debt which was not in default at the time it was obtained," but the Rosenthal Act's definition of
'debt collector' does not contain this limitation.  Compare 15 U.S.C. § 1692a(6)(F)(iii) with Cal.
Civ. Code § 1788.2(c).

Determining damages from the proposed Rosenthal Act violation may not be as formulaic
as Plaintiff suggests.  See Transcript of Proceedings, ECF No. 100, at 10:21-22.  The $500,000
statutory damages amount in 15 U.S.C § 1692k(a)(2)(B) is a ceiling rather than an automatic
entitlement.  See Cal. Civ. Code § 1788.17 (incorporating "the remedies in Section 1692k" into
the Rosenthal Act).  But, for the same reasons discussed supra, the need to engage in an
individualized damages inquiry does not defeat class certification.

### 4.   UCL

"[U]nder the [UCL] 'there are three varieties of unfair competition: practices which are
unlawful, unfair or fraudulent.'"  In re Tobacco II Cases, 46 Cal. 4th 298, 311 (2009) (quoting
Daugherty v. American Honda Motor Co., Inc. 144 Cal.App.4th 824, 837 (2006)).

#### a.   Unlawful Practices

"[U]nder the unlawful prong, the UCL ''borrows' violations of other laws and treats them
as unlawful practices' that the unfair competition law makes independently actionable.'"  Aryeh v.
Canon Bus. Solutions, Inc., 55 Cal. 4th 1185, 1196 (2013) (quoting Cel–Tech Communications,
Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 180 (1999)).  Plaintiff's unlawful
practices claim on her Rosenthal Act claim, and proving it will require the same proof.  For the
same reasons discussed at III-E-3, supra, common issues predominate.

### b.     Unfair Practices

Considering whether a business practice violates the UCL's unfair practices prong requires either that the court balance the practice's harm to the consumer against the benefit to the defendant, or else consider whether the practice violates the letter or spirit of a legislatively declared policy or poses an actual or threatened impact on competition.  See Lozano, 504 F.3d at 735-37.  In either case, as above, proving the claim will primarily require an investigation into the TPP itself and Defendant's uniform practices.  Plaintiff argues that Defendant's "systematic breach" of the TPP constitutes an unfair practice, and as discussed at III-E-1, *supra*, common issues predominate in determining that breach.  Determining whether the breach constitutes an "unfair practice" within the meaning of the UCL does not require an individualized inquiry that would predominate over the common issues.

### c.     Fraudulent Practices

"[T]o state a claim under . . . [the UCL's fraudulent prong] it is necessary only to show that members of the public are likely to be deceived."  Kasky v. Nike, Inc., 27 Cal. 4th 939, 951, (2002) (internal quotation omitted).  "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud," a "distinction [that] reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices."  In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009).

For much the same reasons discussed above, common issues predominate in determining whether the practices at issue were "fraudulent" under the UCL.  As above, Defendant objects to the fact that the FAC mentions certain other allegedly fraudulent communications that were specifically made to Plaintiff and not to other members of the Proposed Class.  To the extent that Plaintiff seeks to recover under the UCL based on practices that were specific to her or on other practices that were specific to other individual members of the class, she is unlikely to be able to

United States District Court
Northern District of California

United States District Court
Northern District of California

maintain a certified class.  But to the extent that Plaintiff makes her claim on the basis of the TPP itself and Defendant's uniform practices as they apply generally to the Proposed Class, there is no predominance obstacle.

### 5. Superiority

A class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998).  There is no reason to think any alternative procedures for adjudicating the claims of the individual class members would be superior to a class action proceeding.  Even if proposed Class Members could still maintain individual actions not barred by the applicable statute of limitations, it would not be fairer or more efficient for them to do so.

"[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  Hanlon, 150 F.3d at 1022 (quoting 7A Wright & Miller, Federal Practice & Procedure § 1777 (2d ed.1986)).  This is the case here.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff Marie Gaudin's motion to certify a class of California borrowers who entered into HAMP TPPs with Saxon effective on or before October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications.

/ / /

/ / /

/ / /

/ / /

The Court also GRANTS Plaintiff's motion to appoint Plaintiff's counsel, Daniel Mulligan, Esq. of Jenkins Mulligan & Gabriel LLP and Peter Fredman, Esq. of the Law Office of Peter Fredman, as counsel for the aforementioned class.

**IT IS SO ORDERED**.

Dated: August 3, 2013

_____
JON S. TIGAR
United States District Judge